## KENYON v KENYON
## Case No. 81-11539-20
Sixth Judicial Circuit, Pinellas County
### August 15, 1990

## OPINION OF THE COURT

JOHN S. ANDREWS, Circuit Judge.

### *FINAL JUDGMENT*

### *HISTORY OF THE CASE*

THIS CASE was tried for two full days before this Court on February 15, 1990, and on April 10, 1990. ROBYN KENYON and ROGER KENYON were divorced by a Final Judgment of Dissolution entered by this Court on November 5, 1981. The Final Judgment of Dissolution incorporated the terms of a Separation Agreement and Property Settlement which was entered into by the parties on September 29, 1981. By the terms of that Agreement, ROGER KENYON agreed to pay ROBYN KENYON Two Thousand Dollars ($2,000.00)

per month permanent periodic alimony, and, in addition, the Agreement provided the following in Paragraph 4(a):

"(a) The alimony obligation of the Husband, including his obligation to pay the premiums on the aforesaid $100,000 term life insurance policy shall terminate upon the remarriage of the Wife, *upon her permanently residing with a non-related adult male,* or the death of either the Husband or the Wife." (emphasis supplied)

ROGER KENYON, prior to the institution of this case, filed in this Court a similar action seeking to terminate the Wife's alimony based upon the Agreement entered into by the parties on the grounds that she was, at that time, "permanently residing with a non-related adult male". He won that case in the lower court. ROBYN KENYON appealed the lower court's Judgment and the Second District reversed. *Kenyon v Kenyon,* 496 So.2d 839. In November of 1987, ROGER KENYON was permanently residing with a non-related adult male, specifically ALVIN J. JENSEN, in or near Maggie Valley, North Carolina. Mr. Jensen is not the same non-related adult male who was the subject of the Husband's first Supplemental Petition to Terminate Alimony. After extensive discovery, motion practice, testimony before this Court on several different occasions by both of the parties during the discovery and motion stages of this case, during which time this Court had several and substantial opportunities to observe the demeanor and candor of the parties and AL JENSEN, the case was tried.

## THE LAW

Three cases in the State of Florida have described and wrestled with the problem of a former husband attempting to terminate alimony based upon the fact of the former wife living with another man. In all of those cases, the former husband, the paying spouse, has lost on appeal. Those cases are *Mulhern v Mulhern,* 446 So.2d 1124, *Kenyon v Kenyon* 496 So.2d 839, and *Herrero v Herreo,* 528 So.2d 1286. Those cases have been very helpful to this Court in understanding the law of Florida as it should apply to the facts of this case, and this Court has applied the law of each of those cases in reaching its judgment in this case. In *Kenyon,* the trial judge made almost no findings to support his conclusion. The Second District, in its opinion, concluded that the proof of eighteen (18) nights of living with another man did not amount to "permanently residing". However, in that case, the court gave no further indication of the evidence that it might require in order to prove "permanently residing".

In *Herrero,* the Second District did give this court a clear indication of the quantum of proof it would require in order to meet the

**97**

Husband's necessary burden. In that case, the Court indicated that there needed to be more than an indication of the sharing of beds. There should be evidence of such things as sharing of closets, dresser drawers and medicine cabinets and that there should be some indication of a merging of life courses.

In *Mulhern,* that court indicated that there would need to be a substantially greater showing than the spending of a few nights together at the boyfriend's apartment, although the court did not give an indication as to what quantum of evidence would be necessary. The court did say that, in that case, there was no evidence that the former wife kept her clothes at the boyfriend's apartment, that she ate or prepared meals there, that she maintained a telephone or mail listing there, or showed any other use or indication that she considered that as her residence.

### THE FACTS OF THIS CASE

ROGER KENYON, this time, has been able to demonstrate by a preponderance of the evidence that ROBYN KENYON is, in fact, permanently residing with a non-related adult male, ALVIN J. JENSEN. That residence is taking place in Mrs. Kenyon's A-frame home near Maggie Valley, North Carolina or in JENSEN's apartment in Maggie Valley, North Carolina. ROGER KENYON has proved, and this Court believes, the documentary evidence presented by the Husband, including photographs and the witnesses presented by the Husband which the Court now summarizes. Photographs taken by ROGER KENYON and CRAIG MEYERS clearly indicate both men's and women's clothing in ROBYN KENYON's closet in her A-frame. CRAIG and LINDA MEYERS testified that they saw AL JENSEN wearing the same clothes that they had seen hanging in ROBYN KENYON's closet. They also testified that AL JENSEN's dirty laundry was in ROBYN KENYON's home. DAWN KENYON, ROBYN and ROGER's daughter-in-law, testified that she saw AL JENSEN's clothes in ROBYN's laundry area and in her washer and drawer. TED CONNOR testified that on one occasion he went to the A-frame with AL JENSEN, and AL JENSEN removed some of his clothing. The clothes that he removed were on a hanger. He further testified that ROBYN and AL not only share the closet in the A-frame, but they share the closet in the apartment across the street from the Wife's restaurant in Maggie Valley. He also testified that when he spent a night in the apartment, he saw women's clothes hanging in the closet.

CRAIG and LINDA MEYERS, DAWN KENYON, ROGER

■■■■■■

KENYON and TED CONNOR all testified that they observed, on widely separated occasions, men's toiletries and shaving equipment in the downstairs bathroom of the A-frame. Further, TED CONNOR testified that, when he stayed in the apartment, he observed ROBY KENYON'S makeup and toiletries in the bath room of that apartment.

The Meyers testified that ROBYN and AL entertained them at the A-Frame, made dinner for them there, and that AL fixed drinks. They were also invited to breakfast with both AL and ROBYN. TED CONNOR testified that he saw ROBYN and AL eating breakfast and drinking morning coffee together at the A-frame. DAWN KENYON, the daughter-in-law, testified that AL JENSEN did not act like a guest when he was at the A-frame while she visited there for a week but that he treated the house as his own and that he and ROBYN stayed together in the upstairs bedroom the whole time she was there.

There was substantial evidence proving that AL JENSEN used ROBYN KENYON's telephone as both his home phone and for business purposes and that he both received and made telephone calls from that phone during the early morning and late evening hours. ROBYN KENYON had, herself, labeled the phone calls on her phone bills which indicated AL JENSEN's usage of the telephone. This Court does not believe that AL JENSEN would leave his apartment, at which he testified he lived, in Maggie Valley, North Carolina, drive up the mountain at 11:00 o'clock at night to use the telephone and then go back to his apartment. This Court further does not believe that he would do that for phone calls as early as 8:00 a.m. In addition, AL JENSEN gave a business card to CRAIG and LINDA MEYERS indicating his home phone number and that phone number is ROBYN KENYON's phone number at the A-frame in Maggie Valley. In addition, JENSEN told MEYERS that he owed ROBYN money for telephone calls, but they heard ROBYN tell him to "forget it". TED CONNOR testified that if he wanted to reach AL JENSEN by telephone, he would call him at ROBYN's. DAWN KENYON testified that more than once during her stay and visit with her mother-in-law, AL JENSEN received telephone calls from his employees at ROBYN's telephone number.

The overall evidence in this case clearly establishes that ROBYN KENYON and AL JENSEN have merged their life courses. They work together, they pay expenses for each other, and they live together. Telephone records put into evidence indicate that even when they were separated, they were constantly in touch with each other by telephone. TED CONNOR and SCOTT COLTON each testified that they observed AL JENSEN with his own set of keys to ROBYN's home,

**99**

ROBYN's restaurant and ROBYN's car. The testimony is clear that AL JENSEN virtually never drives his own vehicle, a truck, but almost always drives ROBYN's automobile and most often with her as a passenger. The MEYERS testified that AL JENSEN told them that ROBYN worked at his produce stand every day for a period of time six days a week all morning until his other employees arrived at work and that she did that for no pay. The testimony is clear, through TED CONNOR, the MEYERS and even from ROBYN KENYON and AL JENSEN, that they later planned, purchased and operated together a restaurant known as Maggie's Galley in Maggie Valley, North Carolina. Even though they claimed to share a partnership interest, which the Court does not rule upon, in the restaurant, it is also clear from the evidence that ROBYN KENYON took the entire loss attributable to the restaurant on her tax return and that the loss was not divided between them. It is also clear from the testimony that AL JENSEN has taken substantial draws from the business, but ROBYN KENYON has taken very few. The MEYERS testified that AL JENSEN told them that he can't live off ROBYN but because he couldn't do anything with his properties right now, he was continuing to live off ROBYN. The exhibits offered into evidence also indicate a merging of life courses. Those exhibits deal with the extent to which the business and personal accounts of ROBYN KENYON and AL JENSEN have been intermingled.

In *Mulhern,* that court indicated that an additional criterion for proving "permanently residing" would be "any other use or intendment . . . normally considered as indicia or criteria in determining residence of where a person resides." All of what has been discussed above addresses itself to that additional criterion. In addition, however, the MEYERS testified that both ROBYN and AL told them of their plans for expending "their" house; the videotape and still photographs show that, on their day off, ROBYN and AL remained at the A-frame together with AL working around the home. ROGER KENYON also introduced into evidence Exhibit No. 20, which is a picture of the name signs of those people living on Hemphill Road which which clearly shows that neither ROBYN KENYON's nor AL JENSEN's names appear. The MEYERS testified that both ROBYN and AL made statements that they are living together and sleeping together and that they can't let anybody find out about it because ROBYN's alimony would stop. They also testified that both ROBYN and AL asked them not to tell anyone about their living arrangements, particularly AL's son, JOHN. ROBYN also told the MEYERS that they felt safe from discovery because they were so secluded. The MEYERS also

100

testified that ROBYN told them that she had lied on the witness stand in her previous alimony modification proceeding and that she had actually been living with that boyfriend.

TED CONNOR testified that he was a long time friend of AL JENSEN and familiar with his lifestyle. Mr. Connor testified that JENSEN described his relationship with ROBYN KENYON as one of being lovers and it had been ongoing since they both lived in Florida or for some two and a half years. He further testified that JENSEN told them that the only reason he rented the apartment across the street from the restaurant was to protect himself in the event his wife came to North Carolina so she wouldn't find out about his relationship with ROBYN and so that he and ROBYN would have some place to stay when there was bad weather and they couldn't get back to ROBYN's home. It was CONNOR's opinon that JENSEN and ROBYN KENYON were living together as man and wife and that they had been doing that since June of 1988, to his personal knowledge. The Husband employed the services of different private investigators over a period of two and a half years and instructed them to go to North Carolina and make observations of ROBYN KENYON and AL JENSEN. On every occasion that a private investigator went to North Carolina, their testimony was that they observed ROBYN KENYON and AL JENSEN living together at the A-frame or at the apartment in Maggie Valley. In fact, one of the times an investigator went to North Carolina was in the interim between the trial days of this case. The same observations were made by that investigator. In addition to all of those times, DAWN KENYON and TED CONNOR were able to supply additional times when ROBYN and AL were living together. In essence, every single time there was observation of ROBYN and AL, they were living together.

On the other hand, both ROBYN KENYON and AL JENSEN denied living together. They produced a witness, MARIE SEBER, a "next door" neighbor. It was Mrs. Seber's opinion that AL and ROBYN do not live together. However, on cross examination she admitted she could see the only entrance to the A-frame and would not know if anyone is there and that she could only see a vehicle in ROBYN's driveway. ROBYN also called as a witness a gentleman named BILL LYNN. Mr. Lynn works in the same building in which AL JENSEN has an apartment. His testimony was to the effect that on many occasions he saw JENSEN leaving the apartment and walking across the street to Maggie's Galley, the restaurant operated by AL and ROBYN. However, Mr. Lynn also admitted on cross examination that he could not say whether anyone, including AL JENSEN, lived in

**101**

the apartment. ROBYN then produced JOHN JENSEN, AL's son. JOHN expressed the opinion that there was no permanent relationship between his father and ROBYN. However, JOHN admitted that when he was in North Carolina, his father was in Florida, and vice versa. ROBYN then produced NATALIE ROTHCHILD and FRANCES PATRICK, mother and daughter, who work for AJ JENSEN in his produce stand. They testified only that JENSEN never talked about any permanent relationship with Mrs. Kenyon, that he had no home telephone in North Carolina and that on several occasions, they contacted him in the winter in Dunedin, Florida.

During her testimony at the trial, ROBYN KENYON admitted previously lying during her deposition.

The foregoing is a summary of the testimony and is not to be taken as a total recitation of all of the testimony.

## THE WITNESSES

The Court has had an opportunity to evaluate the demeanor of all of the witnesses who testified, including the parties. The Court believes the witnesses produced by ROGER KENYON to be more credible and, in fact, disbelieves a substantial portion of the testimony of ROBYN KENYON and AL JENSEN.

## FINDINGS OF FACT

Based upon the foregoing discussion, the Court makes the following findings of fact.

1. This Court has observed the demeanor of all of the witnesses and the parties, the pretrial actions of ROBYN KENYON and AL JENSEN during the discovery stages of this case and has discerned the untruthful testimony under oath of both ROBYN KENYON and AL JENSEN and finds that the more credible witnesses have been produced by the Former Husband, and this Court does not believe substantial portions of the testimony of ROBYN KENYON and AL JENSEN.

2. ROBYN KENYON and AL JENSEN have shared closets and kept their clothing together at both the A-frame house and the apartment in town over a period of two and one-half years.

3. ROBYN KENYON and AL JENSEN have shared bathrooms and kept toiletries and shaving gear together, both at the A-frame and at the apartment in town, for over a period of two and one-half years.

4. ROBYN KENYON and AL JENSEN have eaten and prepared meals together in the A-frame over a period of two and one-half years.

102

5. AL JENSEN possessed and regularly used his own set of keys to ROBYN KENYON's A-frame and her white Raider car.

6. ROBYN KENYON and AL JENSEN have consciously merged their life courses with one another over a period of two and one-half years.

7. ROBYN KENYON and AL JENSEN have resided together at both the A-frame and the apartment on every observed occasions over a period of two and one-half years.

8. Based upon the preponderance of the evidence, the Former Husband has provided that the Former Wife, ROBYN KENYON, and a non-related adult male, AL JENSEN, are "permanently residing with" each other within the meaning or the contract known as the Property Settlement Agreement entered into by the parties.

## JUDGMENT OF THE COURT

Based upon all of the foregoing, it is ADJUDGED as follows:

1. The Former Husband, ROGER F. KENYON, no longer has an obligation to pay alimony pursuant to the terms of the Agreement entered into by the parties, and all payments of alimony owed pursuant to the terms of that Agreement and the Final Judgment of Dissolution are terminated, as of February 15, 1990, as is the Former Husband's requirement to maintain life insurance in order to protect the alimony, as of February 15, 1990.

2. Even though the Court has found the Former Wife and AL JENSEN were permanently residing together for two and one-half years prior to the first day of the trial (February 15, 1990), the Court believes that any entitlement the Former Husband may have to reimbursement for improperly paid alimony payments is limited to the time period beginning with February 15, 1990. Therefore, the Former Husband, ROGER F. KENYON, is entitled to reimbursement from the Former Wife of all alimony payments paid by him for alimony owed from and after February 15, 1990. Leon Whitehurst, Jr., is holding in his escrow account $4,000.00, which money was held in escrow to reimburse the Former Husband on account of the Former Husband's payment of any alimony payment made by him which need not have been paid. Mr. Whitehurst shall continue to hold that money in escrow until further order of the Court. The Court retains jurisdiction to enter further orders and judgments pertaining to reimbursement owed the Former Husband.

3. The Agreement entered into by the parties provided that the party

**103**

at fault shall be responsible for attorney's fees and costs for the other party, if it was necessary for the other party to hire the services of an attorney to enforce the terms of the Agreement. THe Former Husband, having been required to retain counsel to enforce his rights under the Agreement, due to the fault of the Former Wife, is entitled to attorney's fees and costs. Jurisdiction is hereby retained for the purpose of determining the amount of the Former Husband's attorney's fees and costs.

4. Jurisdiction is retained, generally, to enter further Orders or Judgments necessary or appropriate to implement this Final Judgment.

DONE and ORDERED at St. Petersburg, Florida, this 15th day of August, 1990.